JOHN L. BURRIS, Esq., SBN 69888
BEN NISENBAUM, Esq., SBN 222173
JAMES COOK, Esq., SBN 300212
**THE LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

CATHERINE SMITH, individually and as joint
successor-in-interest to Decedent CORY BUSH;
M.B., a minor, individually and as joint
successor-in-interest to Decedent CORY BUSH,
through his Guardian Ad Litem, VICTORIA
MOSELEY ,

                Plaintiffs,

vs.

COUNTY OF BUTTE, a municipal corporation;
MATT KEELING, individually and in his
capacity as a Sergeant for the COUNTY OF
BUTTE; BRIAN EVANS, individually and in
his capacity as a deputy sheriff for the COUNTY
OF BUTTE; ROBERT ALLEN, individually and
in his capacity as a deputy sheriff for the
COUNTY OF BUTTE; BENJAMIN
CORNELIUS, individually and in his capacity as
a deputy sheriff for the COUNTY OF BUTTE
and DOES 1-25, inclusive, individually, jointly
and severally,

                Defendants.

CASE NO.: 2:15-cv-00988-GEB-CMK

**PLAINTIFFS' EXPERT WITNESS DESIGNATIONS**

Plaintiffs hereby disclose the following expert witnesses they intend to call as witnesses at trial and the subjects about which they will testify.  Plaintiffs reserve the right to call any necessary rebuttal witnesses, and any of defendants' expert witnesses who are not identified herein.

1. <u>Police Practices and Procedures Expert:</u>

Roger Clark

Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071

Phone: (208) 351-2458

Mr. Clark will provide expert testimony regarding police practices regarding investigation, detention, arrest, use of force and deadly force, application/use of Taser, apprehension of wanted parolees, and the wrongful use of deadly force, including any and all law enforcement policies, rules, regulations, and/or training bulletins regarding any of the previous noted subjects, supervision, training and discipline of police officers, investigation of officer-involved shootings, and all areas as further noted in Mr. Clark's attached FRCP 26 expert report. (Exhibit A)

2. <u>Non-retained percipient treating experts:</u>

<u>CORONER/AUTOPSY</u>
Tavelli #39721
Deputy Coroner
Butte County Sheriff's Coroner's Office
33 County Center Drive
Oroville, CA 95965
(530)538-7321

B.L. Posey, M.D.
Mark A. Super, M.D.
Forensic Pathologist
1261 Travis Boulevard, Suite 120
Fairfield, CA 94533
Phone: (707) 426-4883

Regarding the autopsy, cause and manner of death of Decedent Cory Bush, physical condition of Decedent at his death, all injuries of Decedent at his death, items of personal property in decedent's possession at the time of autopsy, all gunshot wounds and pathways through Decedent's body, and all other matters described in his autopsy report of Decedent Cory Bush

TOXICOLOGY
B.L. Posy
S.N. Kimble
Central Valley Toxicology, Inc.
1580 Tollhouse Road
Clovis, CA 93611
Phone: (559)323-9940

Regarding toxicology results of blood taken from Decedent Cory Bush after his subject-incident death.

DEATH CERTIFICATE
Mark A. Lundberg, M.D. M.P.H.
Health Officer
County of Butte
202 Mira Loma Drive
Oroville, CA 95965

Alan Smith
Health Officer
County of Butte
202 Mira Loma Drive
Oroville, CA 95965

Mark A. Lundberg listed on Decedent's death certificate. His title is identified on the death certificate as "Health Officer". There is no indication that he has any medical qualifications. He is listed as an expert herein out of an abundance of caution since he signed Decedent's death certificate. However, Plaintiffs do not concede that he is a qualified physician or pathologist.

Dated:  June 27, 2016                **THE LAW OFFICES OF JOHN L. BURRIS**

/s/ *James Cook*
_____

James Cook
Attorney for Plaintiffs
CATHERINE SMITH, et al.

## PROOF SERVICE

I, <u>James Cook</u>, declare as follows:  I am over the age of 18 years and not a party to this action. My business address is 7677 Oakport Street, Suite 1120, Oakland, CA 94621.  I caused the foregoing:

*Expert Witness Designations*

to be served on the following parties in the following manner:

Mail [ X] Overnight Mail [ ] Personal Service [ ] Email [ X]

William E. Camy
PORTER SCOTT
350 University Ave., Suite 200
Sacramento, CA 95825

I declare under penalty of perjury  that the foregoing is true and correct and that this declaration of service was executed in Oakland, CA on June 27, 2016.

Signed: /s/*James Cook*

# EXHIBIT A

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road, Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045

rclark9314@aol.com

June 27, 2016

Mr. John L. Burris, Esq.
Mr. Ben Nisenbaum, Esq.
Mr. James Cook, Esq.
The Law Offices of John L. Burris
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, CA 94621

**Regarding:** ***Catherine Smith, et al., vs. County of Butte, et al., Case No.: 2:15-CV-00988-GEB-CMK.***

Dear Mr. Counsel:

Thank you for retaining me to analyze and render opinions regarding the May 18, 2014, fatal shooting of Mr. Cory Bush (Cory) by Butte County Sheriff's Office (BCSO) Deputy Benjamin Cornelius (Deputy Cornelius). Pursuant to the requirements of Rule 26, I have reviewed the Agency Reports, photographs, audio recordings, deposition transcripts, and other material (as listed below) provided to me thus far regarding this case. Please be advised that if any additional data is provided, a supplementary report may be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events proffered by the defendants versus those proffered by witnesses and other evidence, I do not opine for the trier of fact regarding who are the more believable witnesses. The resolution of any such conflicts are obviously within the purview of a jury to decide.

## Material Reviewed Thus Far:

1.   Amended Complaint for Damages.

2.      Responses to Defendant County of Butte's Special Interrogatories
        Set One.

3.      Plaintiff Responses to the Request for the Production of Documents.

4.      Responses to County of Butte's Special Interrogatories Set One.

5.      Plaintiff Request for Production of Documents to Defendant County
        of Butte (Set One).

6.      Plaintiff's Request for Production of Documents to Defendant City
        (Set One).

7.      Plaintiff's Request for Production of Documents to Defendant
        County of Butte (Set One).

8.      Responses to Defendant County of Butte's Special Interrogatories,
        Set One.

9.      Defendant County of Butte's Interrogatories to Plaintiff Catherine
        Smith, Set One.

10.     County of Butte's Responses to Plaintiff's Request for Production of
        Documents, Set One.

11.     Stipulated Protective Order, Complaint Filed, May 06, 2015.

12.     Transcript of the Recorded Interviews of Seth Bonds and Wendy
        Casner, 0497-0086.

13.     Deposition transcripts:

        a.      Jeri Jaska, April 11, 2016.
        b.      Michael Jeska, April 11, 2016.
        c.      Victoria Moseley, April 19, 2016.
        d.      Daniel Menzes, April 19, 2016.
        e.      Sergeant Matt Keeling, May 5, 2016.
        f.      Deputy Brian Evans, May 5, 2016.

g.   Deputy Robert Allen, May 11, 2016.
h.   Deputy Benjamin Cornelius, May 11, 2016.

14.   POST Basic Learning Domains:
a.   #1: "Leadership, Professionalism, and Ethics."
b.   #2: "Criminal Justice System."
c.   #3: "Policing in the Community."
d.   #5: "Introduction to Criminal Law."
e.   #15: "Laws of Arrest."
f.   #20: "Use of Force."
g.   #21: "Patrol Techniques."
h.   #23: "Crimes in Progress."
i.   #33: "Arrest Methods/Defensive Tactics."
j.   #35: "Firearms/Chemical Agents."
k.   #37: "People with Disabilities."

15.   California Welfare and Institutions Code Sections 5150 - 5157, and 5300 - 5213.

16.   Penal Code Sections 13515.25 and 13515.35 PC.

17.   Columbia Human Rights Law Review, "Unreasonable Seizures of Unreasonable People: Defining the Totality of Circumstances Relevant to Assessing the Police Use of Force Against Emotionally Disturbed People," by Professor Michael Avery, Spring, 2003.

18.   Overview of the incident scene via the internet.


**Brief Overview of Events and Commentary:**

In May of 2014, Mr. Cory Bush resided at 275 Refuge Street, in a rural area of Oroville, California. Mr. Bush lived with his biological son Michael Bush, stepchildren Daniel Menzes (Daniel), Nicholas Sagaste and Rosemary Moseley, and live-in girlfriend Victoria Moseley. Cory was on probation at the time. On May 18th Cory suffered a depression episode and had called the 911 operator. BCSO Deputies under the command of Sergeant Matt Keeling responded to the location. Cory emerged from the residence with a pellet rifle and said he wanted the deputies to shoot him. Cory was shot by Deputy Benjamin Cornelius and succumbed to his injuries.

*Incident:*

On May 18, 2014 between approximately 7:10 p.m. and 8:00 p.m., Cory was in the midst of a significant depressive mental emergency. During the crisis, Cory called the BCSO 911 operator and informed them that he was having a mental breakdown. During the call, Cory told the operator that he was armed with a pellet gun. Cory then informed his step-father, Shannon Moseley, that he had called the BCSO. Realizing that Cory called the 911 operator and that there would be a law enforcement response, Mr. Moseley called the Sheriff's Department, to provide reliable information regarding Cory's mental condition. It was an extensive call lasting approximately twenty minutes and prompted the dispatch of both paramedic and deputies to the scene. Prior to their arrival, Cory left the house and walked to the side yard of his residence. Cory's step-son, Daniel Menzes, went to look for Cory, so that he could give the Deputies more information when they arrived.

BCSO Sergeant Keeling, Deputy Evans (with his K-9), Deputy Allen, and Deputy Cornelius arrived at the residence. When they arrived they were again informed by Mr. Menzes that Cory was having a mental (depressive) breakdown, including that Cory was potentially suicidal. Mr. Menzes told the Deputies that Cory needed help. There was no indication that Cory was a threat to anyone but himself, had harmed anyone, or threatened to harm anyone.

Subsequently, Deputies Cornelius, Evans and Sergeant Keeling took cover behind trees in the front yard. Deputy Cornelius was directly behind the tree and facing the front porch of the residence. Deputy Evans and Sergeant Keeling also took cover behind the same tree and stood behind Deputy Cornelius. Deputy Allen stood to the left of the other Deputies, also facing the door. Deputy Cornelius was armed with an AR-15 rifle and had it at the ready to shoot Cory.

The Sheriff's Deputies verbally ordered Cory to come out of the residence. Cory came out of the house with a pellet gun over his head while yelling for deputies to shoot him. Deputy Evans had a canine that barked at Cory, and was released and charged toward Cory. In response to the barking and threat of being bitten, Cory threw the pellet gun down on the ground. The pellet gun broke open when it dropped to the ground. Deputy Evans' K-9 apparently became distracted and did not make contact with Cory as intended by Deputy Evans. Cory then allegedly reached down and picked up the broken pellet rifle. Deputies rushed forward at Cory and shouted to him to get on the ground. According to Mr. Menzes, Cory turned and bent down towards the gun and said, "it's just a pellet gun." (Deputies testified that they did not hear the statement.) Sergeant Keeling testified that he then ordered Deputy Evans to use his X-26 taser weapon on Cory. This did not occur.

I have also noted that at least one less-lethal (bean-bag) shotgun was available for deployment but was never assigned to a deputy and deployed at the scene. Additionally, each deputy had a canister of O/C spray on their duty belts and did not use it. Rather, as Cory allegedly retrieved the broken pellet rifle and handled it to further break it over his leg, Deputy Cornelius broke his position of cover, moved forward, and while standing in the open front yard, shot Cory three times with his AR-15 rifle. Cory was fatally shot three times by Deputy Cornelius.

> Q.   Okay. And what's the next thing that happened after he picked the rifle back up?
>
> A.   He -- again, was continuing to yell, and I don't know what he was saying, and *he was hitting the rifle over his knee -- or over his leg.*
>
> Q.   Okay. And then what happened?
>
> A.   I yelled at Brian Evans, who was to my right, to tase him.
>
> Q.   Okay. Did he tase him?
>
> A.   No.
>
> Q.   Okay. His taser was out in his hand, correct?
>
> A.   I couldn't tell you that. (Sergeant Keeling Deposition, Page 120. Emphasis added.)

Additionally, Deputy Cornelius has categorically testified that contrary to his POST Basic training, he stepped out of his position of cover and deliberately exposed himself to shoot Cory - and therein created the situation where he believed he had to shoot Cory:

> Q.   Okay. And at the point when he brought the gun up, you had abandoned your position of shelter, correct?
>
> A.   Cover and concealment, yes.
>
> Q.   Now, what would be wrong with maintaining the cover and concealment while allowing the dog to go deal with Cory?
>
> (Objection stated)
>
> Q.   After he had thrown the gun down on the ground?
>
> A.   Tactically *that would have been a better decision, 100 percent. That was a mistake.* (Deputy Cornelius Deposition, page 127)

## Opinions Thus Far:

> 1.   Officers are trained that they are accountable for their tactical decisions when they resort to the use of lethal force. Accordingly,

the reasonableness of an officer's use of deadly force includes consideration of the officer's tactical conduct and decisions leading up to the use of deadly force.  There are significant obvious and avoidable tactical blunders that occurred in this shooting incident that, if followed would have prevented the use of lethal force that occurred.  They include at a minimum:

- Their failure to deploy considering the information provided by the family that Cory was holding a pellet rifle and not a firearm.
- Their failure to consider and deploy according to the information provided by the family that Cory was suffering from a mental breakdown.
- Their failure to deploy tactically knowing that Cory had not harmed any person at the location.
- Their tactical failures to deploy and use the obvious less-lethal options readily available.  Including tactical communications, crisis negotiations, impact (i.e. bean-bag) munitions, chemical agents, a taser and K-9.

2.     Officers are trained that they are responsible for every shot fired. Thus, they are required (and are so trained) to fire their guns only when confronting a credible lethal threat and with deliberate precision and exactness.  This did not occur.  I see nothing in the record that would justify that the shooting of three rounds at Cory by a high-powered AR-15 rifle which could penetrate the residence and endanger innocent persons in the line of fire to lethal force.

3      The use of deadly force in connection with this incident was also unreasonable in this set of facts because there were far more reasonable and obvious less-than-lethal force options available besides shooting Cory.  If any force was appropriate during this incident, it should have been less-lethal force - nothing further.  In my opinion there were fundamental tactical errors (even as admitted by Deputy Cornelius) and a gross lack of situational awareness in this incident.  Sergeant Keeling had formed some type of a failed tactical plan that included the use of a taser when the use of the K-9.  In my experience, a significant number of civilian injuries involving police result from a series of cascading departures from expected and required tactics and deliberate departures from training.  Deputy Cornelius has forthrightly admitted his tactical error when he broke

from his position of cover.  This appears as a key factor in the downward spiral of events resulting in the Cory's shooting death.

4.  Sergeant Keeling failed in his required supervisory and command duties to prevent Deputy Cornelius' use of lethal force.  This includes Sergeant Keeling's failures to make absolutely certain to all personnel (including Cornelius) that because they had been informed that Cory was in possession of a pellet gun and not an actual firearm, that without his (Keeling) express command otherwise, only less-lethal weapons would be authorized.

5.  The BCSO through its chain of command appears to have endorsed the dangerous and out-of-policy tactics that are connected to this incident.  As such, their collective approval of these tactics puts the general public at unnecessary future risk of death and/or injury from Deputy Cornelius and others on the BCSO who have been, or are now, similarly trained and/or supervised.

**Standards Regarding Dealing with Mentally Ill Subjects:**

A key aspect of this incident was the failure of the responding Deputies to follow the POST standards and training regarding officer contacts with subjects who have a mental crisis.  A emotionally/mentally ill person failing to obey an officer's commands is a situation encountered by law enforcement officers on a relatively frequent basis.  The Defendant Deputies appear here to confront Cory with the expectation that he would respond to their orders with routine compliance.  Their expectations and related tactics regarding Cory were unrealistic and contrary to POST training.  It was clear from the outset of the Defendant Deputy's arrival that Cory was suffering from a mental illness - and that, according to the 911 calls, they were made aware of the emotional/mental crisis. In this regard their actions were directly connected to Cory's unnecessary death and violated officer training and POST Standards.  Across the country police departments for decades have recognized and trained their officers in multiple ways to deal with mentally impaired (including mentally impaired persons suspected of criminal conduct) subjects safely and avoid unnecessary force - especially the unnecessary use of force as occurred here - in order to avoid unnecessary serious injury and/or deaths.

The POST standards establish that officers dealing with emotionally/mentally impaired individuals are to calm the situation, to communicate with the individual, to be truthful, and are not to make threats.  To calm the situation, officers are trained to (1) move

slowly, (2) eliminate emergency lights and sirens and disperse any crowd that may have gathered when possible, (3) reduce environmental distractions such as radio or television noise, (4) assume a quiet nonthreatening manner when approaching and conversing with the individual, (5) avoid physical contact if no violence or destructive acts have taken place, if possible (6) explain intended actions before taking action, if possible, (7) take time to assess the situation, (8) provide reassurance that officers are there to help, and (9) give the person time to calm down.

To communicate with a mentally ill individual, officers are trained to (1) keep sentences short, (2) determine if the person is taking medication, (3) talk with the individual in an attempt to determine what is bothering that person, (4) acknowledge the person's feelings, (5) ask if the person if he or she is hearing voices and, if so, what they are saying, (6) avoid topics that may agitate the person, (7) guide the conversation toward subjects that will bring the individual back to reality (e.g., childhood experiences), (8) allow time for the person to consider questions and be prepared to repeat them, (9) do not mock the person or belittle his or her behavior (i.e., delusions or hallucinations).  (POST Learning Domain #37, Chapter 4, "Mental Illness.")

Officers are also trained not to threaten the mentally ill individual with arrest or in any other manner.  Officers are trained that threats may create additional fright, stress, or potential aggression.  Had the Defendant Deputies followed these tactics for dealing with mentally ill individuals, it is more likely than not that the use of lethal force that occurred would not have been necessary and Cory would not have been shot.

## Mentally Ill Sections: 13515.25 & 13515.35 PC:

13515.25 PC.
(a) By July 1, 2006, the Commission on Peace Officer Standards and Training shall establish and keep updated a continuing education classroom training course relating to law enforcement interaction with mentally disabled persons.  The training course shall be developed by the commission in consultation with appropriate community, local, and state organizations and agencies that have expertise in the area of mental illness and developmental disability, and with appropriate consumer and family advocate groups.  In developing the course, the commission shall also examine existing courses certified by the commission that relate to mentally disabled persons.  The commission shall make the course available to law enforcement agencies in California.

(b)    The course described in subdivision (a) shall consist of classroom instruction and shall utilize interactive training methods to ensure that the training is as realistic as possible. The course shall include, at a minimum, core instruction in all of the following:

    (1)    The cause and nature of mental illnesses and developmental disabilities.

    (2)    How to identify indicators of mental disability and how to respond appropriately in a variety of common situations.

    (3)    *Conflict resolution and de-escalation techniques for potentially dangerous situations involving mentally disabled persons.*

    (4)    *Appropriate language usage when interacting with mentally disabled persons.*

    (5)    *Alternatives to lethal force when interacting with potentially dangerous mentally disabled persons.*

    (6)    Community and state resources available to serve mentally disabled persons and how these resources can be best utilized by law enforcement to benefit the mentally disabled community.

    (7)    The fact that a crime committed in whole or in part because of an actual or perceived disability of the victim is a hate crime punishable under Title 11.6 (commencing with Section 422.55) of Part 1.

(c)    The commission shall submit a report to the Legislature by October 1, 2004, that shall include all of the following:

    (1)    A description of the process by which the course was established, including a list of the agencies and groups that were consulted.

    (2)    Information on the number of law enforcement agencies that utilized, and the number of officers that attended, the course or other courses certified by the commission relating to mentally disabled persons from July 1, 2001, to July 1, 2003, inclusive.

    (3)    Information on the number of law enforcement agencies that utilized, and the number of officers that attended, courses certified by the commission relating to mentally disabled persons from July 1, 2000, to July 1, 2001, inclusive.

(4)    An analysis of the Police Crisis Intervention Training (CIT) Program used by the San Francisco and San Jose Police Departments, to assess the training used in these programs and compare it with existing courses offered by the commission in order to evaluate the adequacy of mental disability training available to local law enforcement officers.

(d)    The Legislature encourages law enforcement agencies to include the course created in this section, and any other course certified by the commission relating to mentally disabled persons, as part of their advanced officer training program.

(e)    It is the intent of the Legislature to reevaluate, on the basis of its review of the report required in subdivision ©, the extent to which law enforcement officers are receiving adequate training in how to interact with mentally disabled persons.

13515.35.

(a)    The commission shall, upon the next regularly scheduled review of a training module relating to persons with disabilities, create and make available on DVD and may distribute electronically a course on how to recognize and interact with persons with autistic spectrum disorders. This course shall be designed for, and made available to, peace officers who are first responders to emergency situations.

(b)    The training course shall be developed by the commission in consultation with the Department of Developmental Services and appropriate community, local, or other state organizations and agencies that have expertise in the area of autism spectrum disorders. The commission shall make the course available to law enforcement agencies in California.

(c)    In addition to the duties contained in subdivisions (a) and (b), the commission shall distribute, as necessary, a training bulletin via the Internet to law enforcement agencies participating in the commission's program on the topic of autism spectrum disorders.

In accordance with the Penal Code, specific training to persons with mental illness is included in the POST Basic curriculum (Learning Domain #37: "Persons with Disabilities," Chapter 4, "Mental Illness.") and states in part:

"Law enforcement routinely encounters persons with mental illness in a variety of settings. The causes and impacts of mental illness vary and are not bound by race, gender, or socioeconomic status.

"How peace officers respond to persons living with a mental disorder can have tremendous impact on how these encounters will be resolved. The basic philosophy of any law enforcement officer should be to respond in a manner that is humane, compassionate, and supportive.

"Mental illnesses are a medical condition that affect a person's thinking, feeling, mood, ability to relate to others, and disrupts daily functioning. Persons managing a mental illness can have a substantially diminished capacity for coping with the ordinary demands of life. Mental illnesses can affect people of any age, race, religion, or income and background. Several million people in this country are diagnosed with a serious long term mental illness. The good news about mental illness is that recovery is possible." (POST Learning Domain #37, page 4-4.)

As stated above, the basic training materials regarding persons suffering from mental illnesses express concerns for the safety of the public, the responding officers, and the subject of the incident. A centerpiece of the basic training and policies includes the recognition that all mentally disturbed subjects are considered to be ill-not a criminal suspect. This expectation applies to this incident and includes:

- Dealing with the "Threat Triad" (feeling threatened, out of control and out of options).
- Interpersonal engagement and de-escalation (slowing down to reduce anxiety).
- Use of backups (reduces necessity for force).
- Tactical considerations (proper use of basic field tactics).
- Effective communication and initial response (understanding mental illness behaviors and the use of tactical communication methods).
- The crisis cycle (as anxiety increases, the subject's ability to comply decreases).
- Crisis intervention teams (the use of trained personnel to intervene).
- Force options (must be reasonable and suited to the situation).

In this incident the responding deputies appear to have failed to follow the basic training materials on handling a person with an emotional/mental illness in their encounter with Cory. As articulated by Professor Avery, the Defendant Deputies lack of training or failure to comply with the required tactics, exacerbated the tensions inherent in the confrontation with a possibly mentally ill and/or emotional distraught person, which resulted in the needless and avoidable "violent outcome" of Cory's shooting.

**The Tactical Requirements Regarding the Police Response to Crimes in Progress:**

As cited above, POST Learning Domain 23, "Crimes in Progress" provide key basic training to all law enforcement officers in California, which in my opinion states a number of the significant fundamental and avoidable tactical errors that, if followed, would have prevented this shooting incident.  Chapter 4 - "Responding to Other High Risk Situations" states as follows:

### Overview - Learning need

To ensure the highest chance of survival and the safest possible outcome for an involved individuals, officers must recognize the dngers associated with high-risk situations and employ effective tactics.

### Introduction

When officer respond to crimes in progress calls, there is always the possibility that the crime in progress will escalate into barricaded suspect or hostage situations. The responding officer's primary objective in these situations remains reverence for human life.

### Approach and arrival

Responding officers should apply sound tactics when approaching the scene including:
- Notify dispatch upon arrival at the scene
- Approaching in a quiet and safe manner
- Maintaining cover and concealment
- Evaluating the circumstances
- Providing information to dispatch, other responding officers, supervisors, etc.

### Location of suspects

In high-risk situations involving barricaded suspects or hostages, information is critical.  The primary unit should attempt to identify and verify the exact location and number of the suspects and hostages. Responding officers may be able to obtain additional information from:

- Interviews with individuals associated with the crime scene (e.g. building owner/responsible party, employees, witnesses, etc.)
- Floor plans
- Maps, charts
- Other available documents

**Requesting assistance**

If available, officers may request specialized units and resources as soon as it has been determined that a hostage situation exists or that the suspect/s) has taken a barricaded position (e.g., supervisor, SWAT Team, crisis negotiator, etc.)..." (Post Learning Domain, Chapter 4 - Responding to Other High Risk Situations (Pages 4-1 - 4-4,)

Additional relevant training statements in Chapter 4 of Learning Domain 23 include:

- "Debrief those individuals who could provide additional information relevant to the situation." (page 4-5.)
- "Focus on the goal - Remember the goal is to resolve the incident safely, without injury or loss of life." (Page 4-5.)
- "Do not rush." (Page 4-5.)
- "Communication in an appropriate manner - All communication with the suspect(s) should be as nonthreatening as possible, and Do no escalate the situation by issuing ultimatums to the suspect(s) or, making the suspect(s) feel trapped or pressured." (Page 4-5.)

**The Basic Rules Trained Regarding the Use of Deadly Force:**

Peace officers are trained that by accepting their badges and guns they must act at all times in consideration of the extreme value our society places on all human life. Firing a firearm at a human being is different from all other police uses of force. While there are other police tactics and tools that can qualify as deadly force, none carry the same high probability of death as the use of the officer's firearm. Accordingly, deputies are trained that they can only use firearms under the most extreme circumstances. These situations are very rare. In fact, studies indicate that only a very few police officers in the United States ever fire their weapons in the field during their entire careers.

Officers are trained at the POST Basic academy that the use of force must meet an

*"Objectively Reasonable"* standard. The following quotes from POST typifies the training (emphasis added):

> "A *reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." (Learning Domain #20: "Introduction to the Use of Force," page 1-4.)

Further, POST teaches early on in the basic curriculum the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

> "The criminal justice system gives law enforcement two extraordinary powers:
> 1.   The power of arrest and
> 2.   The power to use deadly force.
>
> "The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost of care and restraint.* This is why it is important to emphasize that *peace officers do not confer "police powers" on themselves.* These powers come to the criminal justice system from the people they serve." (Learning Domain #2: "Criminal Justice System," page 1-4. Emphasis added.)

Additionally, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances." (Learning Domain # 20 "Use of Force," Chapter 2.).

POST training specifies that the use of force under the "totality of circumstances" is only justified on the basis of an "objectively reasonable" standard. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *"A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances."* POST defines "Unreasonable Fear" as: *"Generated in the officers's mind with no direct correlation to facts and situations."* (Learning Domain # 20, Chapter 5. Emphasis added.). Officers are also taught that POST requires that any use of deadly

force must be based on an "objective" rather than "subjective") "reasonable necessity" of action to "imminent danger." (Learning Domain # 20, Chapter 3).

A great deal of emphasis is placed on tried and proven tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death. As stated above, the training domains in this regard have even given this type of reckless and dangerous behavior a specific name: *Tombstone Courage."* POST has also given a specific name to tactical mistakes that are likely to lead to injury or death: *"Fatal Error."*

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of

police officers.  Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings.  We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations.  These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations.  In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1450 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics,

management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers

must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, and New York. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Idaho, Montana, North Carolina, Oregon, Kentucky and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force. *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth

Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certification as an expert in the general use and deployment of the TASER weapon occurred in San Francisco, California on January 29, 2015 in *Andre Little, an Individual, v. City of Richmond, et al.*, Case No: CV-1302067-JSC. There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I declare under penalty of perjury that the foregoing is true and correct. Executed June 27, 2016, at Santee, California.


Roger A. Clark

# Roger A. Clark
## Police Procedures Consultant, Inc.
10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com
June 27, 2016

Mr. John L. Burris, Esq.
Mr. Ben Nisenbaum, Esq.
Mr. James Cook, Esq.
The Law Offices of John L. Burris
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, CA 94621

**Regarding:**     **Catherine Smith, et al., vs. County of Butte, et al., Case No.: 2:15-CV-00988-GEB-CMK.**

Dear Mr. Counsel:

My fee schedule is as follows:
- Travel time at the rate of $50.00 per hour.
- All case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $250.00 per hour.
- All testimony (either at trial or deposition) at $350.00 per hour, with a two hour minimum required.
- A retainer fee of $3,000.00 when initially retained will be used against the above listed fees.  Subsequent billings at the rates specified.
- A "rush fee" of $500.00 for work required less than three weeks from notice/retention.
- An invoice will be submitted periodically reflecting the activities and charges associated with the account.  Payment is due upon receipt of the invoice.

There is no formal contract required.  My Federal Tax ID Number is **72-1576857.**

Sincerely,

Roger A. Clark

Page 1 of 1