1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CATHERINE SMITH, individually and as        No.  2:15-cv-00988-KJM-CMK
     joint successor-in-interest to decedent Cory
12   Bush; and M.B., a minor, individually and
     as joint successor-in-interest to decedent
13   Cory Bush, through his guardian-ad-litem,    ORDER
     Victoria Moseley,
14
                    Plaintiffs,
15
            v.
16
     COUNTY OF BUTTE, a municipal
17   corporation; MATT KEELING,
     individually and in his capacity as a
18   Sergeant for the County of Butte; BRIAN
     EVANS, individually and in his capacity as
19   a deputy sheriff for the County of Butte;
     ROBERT ALLEN, individually and in his
20   capacity as a deputy sheriff for the County
     of Butte; and BENJAMIN CORNELIUS,
21   individually and in his capacity as a deputy
     sheriff for the County of Butte,
22
                    Defendants.
23

24

25          On May 18, 2014, Deputy Benjamin Cornelius shot and killed Cory Bush, a young

26   man armed with a pellet rifle.  The decedent's mother and minor child now sue the County of

27   Butte and four individual officers for use of excessive force in violation of the U.S. Constitution.

28

                                          1

Defendants jointly move for summary judgment. ECF No. 23. Plaintiffs oppose, ECF No. 27, and defendants have replied, ECF No. 29. The court heard the motion at hearing on December 16, 2016, at which Benjamin Nisenbaum appeared for plaintiffs, and Stephen Horan and William Camy appeared for defendants. Hr'g Mins., ECF No. 30. For the reasons stated below, after careful consideration in this inherently difficult case, the court GRANTS defendants' motion for summary judgment.

I.    BACKGROUND

        A.    Factual Background

        The following facts are undisputed unless otherwise stated. Where a genuine dispute exists, the court draws reasonable inferences in plaintiffs' favor. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

        On May 18, 2014, Mr. Shannon Moseley of 275 Refuge Avenue, Butte County, called 911 to report that his daughter's boyfriend, Cory Bush, had "gone off the deep end," was tearing apart the Moseleys' house, and was ranting, raving, and yelling. Undisputed Material Facts ("UMF") 1, 3, 26, ECF No. 23-2. At about 6:55 p.m., Moseley stepped outside to make the call while his daughter stayed in the house "[to try] to control [Bush]." Ex. B, 911 Call Transcript ("911 Tr.") at 2:12–14, ECF No. 24-1; UMF 1. Moseley explained that Bush instructed him to call the police because he wanted to commit "suicide by cop." UMF 14; 911 Tr. at 3:26–4:2. Moseley believed Bush was on methamphetamine, UMF 3, 11, 26, was having "a really bad" mental breakdown, 911 Tr. at 14:07–08, and had "just snapped," 911 Tr. at 6:20–21. Although Moseley believed "[Bush had] got the kids scared pretty bad," 911 Tr. at 15:16, he also said he did not believe Bush was a threat to them, 911 Tr. at 7:26. Moseley did not want to call 911, but Bush had said, "[I]t's only gonna get worse . . . . This won't end. I'll tear this house to smithereens." 911 Tr. at 9:02, 13:24–25. Moseley also told the dispatcher more than twenty times that Bush had armed himself with a rifle-style pellet rifle that could "pass for a .22." *See generally* 911 Tr. At one point, Mr. Moseley told dispatch there was a dog on the property, but he said it was "chained up, so the officers don't gotta worry about him." 911 Tr. at 12:22–23.

The Butte County Sheriff's Office dispatched four officers to respond and they are the four individual defendants here: Sergeant Keeling; Deputy Evans, with his K-9 "Duke;" Deputy Allen; and Deputy Cornelius. UMF 6, 10. All officers had received training in crisis intervention and communication with the mentally ill and suicidal. Deputies Evans and Cornelius had received Crisis Intervention Team certified training, which trains on best practices and meets the first responder "National Gold Standard" for police-based interaction with persons affected by mental illness, including those threatening suicide. UMF 86. Before this incident, Sergeant Keeling had received Critical Incident Training for supervisors and training in Tactical Communication and Mental Health; Deputy Cornelius had training in Crisis Intervention Tactics, Suicide Risk Detection and Prevention, Tactical Concepts for Rural Operations, and Tactical Communications; Deputy Evans had training in Crisis Intervention Tactics, Suicide Risk Detection and Prevention, Tactical Communications, and Dealing with Developmentally Disabled Persons; and Deputy Allen had training in Tactical Communications, and Suicide Risk Detection and Prevention. UMF 87. Deputy Evans and his K-9 had together received continuous training, graduated from a five week course, and been certified by an independent evaluator as satisfying police standards for K-9 units. Ex. W, Evans Decl. ¶ 4, ECF No. 24-6.

Before responding to Mr. Moseley's location, the four officers met at the Palermo sub-station to make a plan. UMF 15, 16. They had received highlights from Mr. Moseley's call to dispatch but not all of the details. The officers had been told Bush was armed with a pellet rifle that could shoot one bullet at a time; it was black and looked like a .22 caliber rifle. UMF 26. During the officers' planning discussion, Deputy Cornelius told them he knew Bush; he also said the pellet rifle was "high powered" and that a shot from it "would definitely penetrate a skull." UMF 18. Cornelius's prior contact with Bush was during an incident in which Bush had been stabbed. Cornelius Depo. at 43–45. The officers decided Cornelius would be the primary communicator with Bush; Deputy Evans was to deploy his K-9 as a less lethal force option, if necessary; and Sergeant Keeling and Deputy Allen were to provide back up. UMF 17, 19–20, 23. All officers were armed with guns, and Deputies Allen and Evans and Sergeant Keeling also each had a Taser, a less lethal electroshock weapon that may be effective up to 14 feet. UMF 21–22,

24–25.  Cornelius testified at deposition that Tasers were referenced for the first time only when shots were being fired, when Keeling simultaneously shouted for the officers to use their Tasers. (*See* Cornelius Depo. at 79.)  The other officers do not recall discussing other less lethal options, and Tasers in particular, at the substation where they formulated their plan.  (*See* Keeling Depo. at 59:8–15; Allen Depo. at 39:13–23; Evans Depo. at 31:17–20.)[1]  In sum, the undisputed facts are that while some of the officers carried Tasers, their use was not discussed as a less lethal force option before the encounter with Bush.  Instead, the officers planned on relying exclusively on the K-9 as the less lethal force option.

Twenty-five minutes into the 911 call, Moseley reported that "[Bush] want[ed] to see it to fruition," 911 Tr. at 18:04, presumably referring to Bush's intention to commit suicide by cop.  Within a minute and a half of that statement, at about 7:25 p.m., the officers arrived on scene and met Moseley in front of the house.  *See* 911 Tr. at 19:12–13; UMF 30, 32–33.  Moseley told the officers Bush had a pellet gun and is "really mentally screwed up."  911 Tr. at 19:12–18. Moseley was still on the phone with the 911 operator when the officers arrived, and the 911 call partially recorded his statement, time stamped at 26 minutes 43 seconds.  *Id.*  Moseley then ended the call.

At this point, given the time of year it was still light outside.  UMF 31.  The officers positioned themselves at the edge of the property behind a tree and fence post.  UMF 35. From that position, at approximately 7:27 p.m., Deputy Cornelius used a public address system to call toward the house several times that the Sheriff's Office was outside, saying the officers wanted Bush to come out, and they were there to help him.  UMF 38, 41.  Bush yelled, "I'm coming out," and emerged from the house holding a pellet rifle.  UMF 42.  Bush yelled and screamed at the officers as he emerged, and though his yelling was largely unintelligible, he screamed, "Shoot me, shoot me."  UMF 47–48.  At the same time he walked quickly towards Deputies Evans and Cornelius, who were about 75 feet away, despite the officers' repeated orders

---

[1] The depositions were too large to file electronically, so the parties only electronically filed portions and mailed the remainder.  This particular deposition page (Evans Depo. page 31) was contained on a CD labeled Exhibit QQ.

4

to stop, get on the ground, and drop the pellet rifle. UMF 49–51. As he walked, Bush waved the pellet rifle in the air and pointed it in the deputies' direction, all while continuing to yell and scream at them. *Id.*; Ex. QQ, Evans Depo. at 40:25–41:4, ECF 24-8. In response, Deputy Evans deployed his K-9 and ordered it to bite Bush. UMF 52. As the K-9 approached, Bush threw his pellet rifle to the ground and raised his hands. Ex. QQ, Cornelius Depo. at 109:18–21, ECF No. 24-8; Ex. QQ, Moseley Depo. at 83:10–11, ECF No. 24-8.

The parties dispute what happened next. Plaintiffs contend Bush threw his pellet rifle so hard it broke open and a spring fell out, rendering the rifle inoperable, and that the officers were close enough to see the spring fall out. *See* Ex. QQ, Menzes[2] Depo. at 24:10–12, 28:19–20, 50:22–51:05, ECF No. 24-8. Defendants contend no officer saw the rifle break open in any way, Ex. QQ, Allen Depo. at 86:13–18, ECF No. 24-8, and they provide evidence that the California Department of Justice test-fired the rifle after the incident and determined it was operational, UMF 82; Ex. QQ, Wallace Depo. at 38:21–23, ECF No. 24-8. What is not genuinely in dispute, however, is that when Bush appeared to surrender, Deputies Cornelius and Evans left their positions of cover and moved quickly towards him. *See* Cornelius Depo. at 116:12–119:4; Evans Depo. at 50:15–51:01, 63:12–64:15. Then, before the officers reached Bush, the K-9 unexpectedly veered away from Bush and the officers and towards the pit-bull chained to a tree in the front yard. UMF 55.

With the K-9 ignoring the officers' commands, Bush retrieved his pellet rifle from the ground. Cornelius Depo. at 119:01–04; Menzes Depo. at 28:25–29:10. Deputy Allen states Bush was standing upright, then bent over, picked the rifle up, struck it over his knee repeatedly, then pointed it at Cornelius. Allen Depo. at 85:8–17, 86:7–12. Deputy Cornelius and Sergeant Keeling do not specify if Bush was standing, but both say he bent over to pick up the rifle, repeatedly banged it over his knee, and then pointed it at Deputy Cornelius. Cornelius Depo. at 122:3–15; Keeling Depo. at 120:1–7, 122:3–15. Menzes describes Bush as "crouched" after

---

[2] Daniel Menzes is the oldest son by a prior marriage of Victoria Moseley, Bush's girlfriend.

5

picking the rifle back up, but he also says he could not see Bush for the few critical seconds leading up to the shooting because the officers were in a position that obstructed his view. Menzes Depo. at 28:25–29:10, 32:2–4, 41:1–12. Deputies Cornelius and Evans repeatedly yelled for Bush to drop his weapon and keep his hands up, but Bush ignored their orders. UMF 50, 58; Cornelius Depo. at 119:15–18. Instead, Bush screamed at the officers, "Shoot me, [expletive]. I want to die, shoot me." Menzes Depo. at 7:5–7, 29:20–24. Deputies Cornelius and Evans had no cover, Cornelius Depo. at 127:12–14, and Sergeant Keeling yelled to Deputy Evans to use his Taser on Bush, UMF 56, 61. The parties agreed at the motion hearing that Deputies Cornelius and Evans were approximately 17 feet from Bush when Sergeant Keeling yelled the Taser command.

The parties dispute what happened when Sergeant Keeling yelled "Taser." Defendants say that Bush, after hearing the Taser command, immediately lifted his pellet rifle and pointed it directly at Deputy Cornelius. Cornelius Depo. at 121:22–23. Plaintiffs present testimony that Bush never pointed the pellet rifle at any of the deputies. Menzes Depo. at 41:1–12; Moseley Depo. at 79:5–80:8. Nevertheless, the parties agree Deputy Cornelius fired three rounds, all of which struck Bush, and Bush died as a result of the gunshot wounds. UMF 63, 65. The shots occurred 28 minutes and 8 seconds after Mr. Moseley called 911. 911 Tr. at 20:19–20. More significantly, Deputy Cornelius fired his shots at Bush less than one minute from the time he had called to Bush to come out of the house. *See* UMF 41 (call to house at 7:27:31 p.m.), 64 (Keeling radioed "shots fired" at 7:28:06 p.m.). Plaintiffs concede no emergency life-saving services of any kind could have saved Bush. UMF 65.

Bush's pellet rifle, a Daisy Powerline 1000, is pictured below:



Ex. J, Defense Forensic Expert Lance Martini Report at 27 ("Martini Expert Report"), ECF No. 24-4.  As defendants' counsel agreed at hearing, Bush's pellet rifle is a single shot weapon that must be pumped at least once before being operable.  *See* 911 Tr. at 5:2–3; Menzes Depo. at 21:8–11.  Consistent with Deputy Cornelius's report to his colleagues in their pre-planning meeting, the parties agree that pellet rifles can pose a risk of serious physical injury or death, that air gun deaths are documented in the forensic and medical disciplines, and a warning engraved on the barrel of Bush's pellet rifle reads: "Warning: misuse or careless use may cause serious injury or death."  UMF 80–81.

## B.  Procedural Background

On May 6, 2015, plaintiffs filed a complaint making nine claims as successors-in-interest to decedent Cory Bush: (1) violations of Bush's Fourth Amendment right to be free from unreasonable seizures under 42 U.S.C. § 1983; (2) violations of plaintiffs' right to familial relationship guaranteed by the Fourteenth Amendment under 42 U.S.C. § 1983; (3) a *Monell*[3] claim against Butte County; (4) assault and battery; (5) negligence; (6) intentional infliction of emotional distress; (7) negligent infliction of emotional distress; (8) wrongful death; (9) and violations of the Bane Act under California Civil Code section 52.1.  ECF No. 1.  On November 15, 2016, after the close of discovery, defendants filed the pending motion for summary judgment on all claims.  Defs.' Mot. for Summ. J. ("MSJ"), ECF No. 23.  As noted, plaintiffs oppose, Pls.' Opp'n, ECF No. 27, and defendants filed a reply, Defs.' Reply, ECF No. 29.

## II.  LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

---

[3] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[4]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001)

---

[4] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010 amendments.

(citing *Celotex Corp.*, 477 U.S. at 324).  The party seeking admission of evidence "bears the burden of proof of admissibility."  *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment.  *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

III.     DISCUSSION

A.       Violation of 42 U.S.C. § 1983 – Unlawful Seizure

Plaintiffs direct their first claim of unlawful seizure based on unreasonable and excessive force leading to death in violation of the Fourth Amendment against Sergeant Keeling and Deputies Evans, Allen, and Cornelius.  Defendants argue they are entitled to qualified immunity on this claim because the officers' actions were reasonable and they did not violate clearly established law.  Defs.' MSJ at 13–25.

The doctrine of qualified immunity balances "the need to hold [officers] accountable when they exercise power irresponsibly and the need to shield [officers] from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To achieve this balance, qualified immunity shields officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson*, 555 U.S. at 231).  Qualified immunity is not "a mere defense to liability," but rather "an *immunity from suit*," and "it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 512 (1985) (emphasis in original); *accord Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014).  Therefore, the court "should make a ruling on immunity 'early in the proceedings'."

*Santos v. Gates*, 287 F.3d 846, 856 (9th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)).

In evaluating whether to grant qualified immunity, the court considers: "(1) whether, taking the facts in the light most favorable to the nonmoving party, the officers' conduct violated a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct." *Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011) (citing *Saucier*, 533 U.S. at 200–01). The court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis [to] address[ ] first." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (citing *Pearson*, 555 U.S. at 236). If the court finds either the officers did not violate a constitutional right or the right was not clearly established, "then the officers cannot be held liable for damages." *Glenn*, 673 F.3d at 870 (citing *Pearson*, 555 U.S. at 236). The court elects to begin its qualified immunity analysis in this case by evaluating whether the officers' use of force was excessive.

### 1.    Unlawful Seizure Based on Deadly Force

The use of deadly force is understood in constitutional law as a seizure subject to the Fourth Amendment. *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). In evaluating a Fourth Amendment claim of seizure based on the use of excessive force, the court asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Reasonableness "must [therefore] be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citation omitted).

To determine the reasonableness of the officers' actions here, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Glenn*, 673 F.3d at 871 (quoting *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)). Even in cases "where some force is justified, the

amount actually used may be excessive." *Santos*, 287 F.3d at 853 (citation omitted).  The court

must also consider the government's interest in the use of force and then balance that interest

against "the severity of the intrusion on the individual's Fourth Amendment rights."  *Newmaker*

*v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016) (citing *Graham*, 490 U.S. at 396), *accord*

*Glenn*, 673 F.3d at 871.  To evaluate the government's interest, the court considers "the totality of

the circumstances."  *Garner*, 471 U.S. at 9.  Relevant factors include "(1) the severity of the

crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and

(3) whether the suspect was resisting arrest or attempting to escape."  *Espinosa*, 598 F.3d at 537

(citing *Graham*, 490 U.S. at 396).  Of these factors, the most important is "whether the suspect

posed an immediate threat to the safety of the officers or others."  *A. K. H by & through Landeros*

*v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Mattos*, 661 F.3d at 441).  But

these factors are not exhaustive, and "[o]ther relevant factors may include the availability of less

intrusive force, whether proper warnings were given, and whether it should have been apparent to

the officer that the subject of the force used was mentally disturbed."  *Hughes v. Kisela*, 841 F.3d

1081, 1085 (9th Cir. 2016).

      The Ninth Circuit cautions that summary judgment should be granted "sparingly"

in excessive force cases because they "nearly always requires [the fact finder] to sift through

disputed factual contentions, and to draw inferences therefrom."  *Glenn*, 673 F.3d at 871

(brackets and quotation omitted).  "[P]olice misconduct cases almost always turn on a jury's

credibility determinations."  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052,

1056 (9th Cir. 2003).  At the same time, the Ninth Circuit has on multiple occasions affirmed

grants of summary judgment for officers in excessive force death cases, depending on the facts of

the case.  *See, e.g., Lal v. California*, 746 F.3d 1112 (9th Cir. 2014) (no excessive force in fatally

shooting suspect holding football-sized rock over his head while advancing on officers; officers

reasonably feared serious physical harm, repeatedly warned suspect to drop rock, had just chased

him at high-speed, and heard him declare suicidal intent); *Gregory v. Cty. of Maui*, 523 F.3d 1103

(9th Cir. 2008) (no excessive where officers forced trespassing suspect to ground and he suffered

heart attack; suspect had just assaulted someone, was acting "bizarre," was reportedly on drugs,

and had threatened officers with pen); *Marquez v. City of Phoenix*, 693 F.3d 1167 (9th Cir. 2012) (no excessive force where officers stun-gunned a suspect to death after he kicked one officer in the groin, refused to heed commands, and barricaded himself in room with an injured adult and distressed child nearby), *as amended on denial of reh'g* (Oct. 4, 2012); *Reynolds v. Cty. of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996) (finding use of deadly force reasonable where suspect was armed, erratic, had just swung knife at officer, with other people nearby), *overruled on other grounds by Acri v. Varian Assocs., Inc*., 114 F.3d 999 (9th Cir. 1997); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) (officers "clearly" reasonable, even though not using least intrusive response, when after hearing suspect was acting "crazy" and firing shots, they took up arms, knocked on his door, identified themselves as police, and fatally shot him when he appeared with gun).

According to plaintiffs, the officers unreasonably:  (1) developed and executed a plan to approach Bush; (2) used deadly force in shooting Bush; and (3) failed to provide Bush with medical aid in the course of seizing him.  The court analyzes these allegations separately.

a)    <u>The Plan</u>

Plaintiffs allege the plan the officers developed at the sub-station "was counter-intuitive[,] ill-fated[,] and the source of all subsequent follies and unreasonable acts."  Pls.' Opp'n at 11.  According to plaintiffs, flaws in the plan included the identification of improper tactics for dealing with a mentally ill individual, a failure to gather additional information from family members in advance, and the choice of a K-9 as the first-used less-lethal option.  *See id.* at 11–12.  As discussed below, the court finds no reasonable jury could find the officers' plan was unreasonable.

It is undisputed that the officers did not suspect Cory Bush of having committed a crime.  He was reportedly having a mental breakdown, might have been on drugs, had never threatened anyone, and by all accounts he wished to commit "suicide by cop."  However, courts "refuse[ ] to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals."  *Hughes*, 841 F.3d at 1086 (quoting *Bryan*, 630 F.3d at 829).  That is not to

say officers should be blind to a suspect's mental illness.  Officers should typically use less forceful tactics

> when dealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal . . . because when dealing with a disturbed individual, "increasing the use of force may exacerbate the situation," unlike when dealing with a criminal, where increased force is more likely to "bring a dangerous situation to a swift end."

*Glenn*, 673 F.3d at 877 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001)).  But even when the suspect is mentally ill, the inquiry ultimately centers on the reasonableness of the officers' actions.  *See id.* at 871.

Based on the information the officers had when they responded to Mr. Moseley's 911 call, "[a] reasonable jury could conclude . . . there were sufficient indications of mental illness to diminish the governmental interest."  *See Hughes*, 841 F.3d at 1086.  As noted above, the most important factor in assessing the governmental interest is whether the suspect posed an immediate threat to the officers' or public's safety.  *See, e.g.*, *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003).  In this case, before the officers contacted Bush, they knew he was mentally disturbed and acting erratically, possibly high on methamphetamine, and had been "tearing up" the 911 caller's residence.  *See* UMF 26.  They also knew Bush was roaming the house with a pellet rifle that could cause serious physical injury or death.  *See* UMF 18, 80–81.  They knew there were other people in the house, including two toddlers.  UMF 26.  While Mr. Moseley said the children were scared, he reported he did not think Bush was a threat to anyone in the house and he had not wanted to call 911; he stepped out of the house to make the call, leaving his daughter and the children in the house.  911 Tr. at 2:14–16, 9:02, 13:23–25.  Under these circumstances, the court finds no reasonable jury would find the officers' belief that Bush was a possible threat to public safety unreasonable.  *See Lal*, 746 F.3d at 1118 (officers' decision to engage with suicidal suspect was reasonable when suspect was a potential threat to public safety).

A reasonable jury also could not find the plan the officers devised in response to this potential threat was unreasonable.  It was objectively reasonable to assign Deputy Cornelius to be the primary communicator with Bush, UMF 19, given his prior contact with Bush, UMF 17,

13

and training in Crisis Intervention Tactics and Suicide Risk Detection and Prevention, UMF 87.

It was reasonable for the officers to carry their weapons, considering Bush was armed with a potentially deadly pellet rifle. *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987) (finding officers' use of deadly weapons reasonable where suspect approached within three to five feet of an officer with arms raised above his head, a rock in one hand and stick in the other); *cf. Lal*, 746 F.3d at 1117 (finding officers' use of deadly force reasonable where they were confronted with a person holding a rock over his head, in part, because officers explored less lethal methods of dealing with suspect, including the engagement of a K-9 unit). It also was reasonable for the officers to plan to use Deputy Evans's trained K-9 as a less lethal force option, should the need arise. *Cf. Smith v. City of Hemet*, 394 F.3d 689, 707 (9th Cir. 2005) (declining to decide categorically whether the use of police dogs constitutes deadly force). As noted above, Deputy Evans and his K-9 had together received continuous training, graduated from a five week course, and been certified by an independent evaluator as satisfying police standards for K-9 units. Ex. W, Evans Decl. ¶ 4, ECF No. 24-6. There is no evidence in the record regarding the K-9's prior deployments, and so no indication of any problems arising from its use.

The court also finds subsequent events would not lead a reasonable jury to conclude the officers should have reconsidered their plan. When the officers arrived outside the residence, they stopped on the road to speak with Mr. Moseley about his 911 call, and confirmed Bush, Bush's girlfriend Victoria Moseley, and children were still inside the house. UMF 33. Plaintiffs contend the officers acted unreasonably by failing to take the time to gather "valuable" information from family members, that the pellet rifle was cracked, inoperable, and unloaded. Pls.' Opp'n at 11. The Ninth Circuit, however, has "placed important limitations on [ ] line[s] of argument" "'based merely on bad tactics that result in a deadly confrontation that could have been avoided.'" *George v. Morris*, 736 F.3d 829, 839 n.14 (9th Cir. 2013) (quoting *Billington v. Smith*, 292 F.3d 1177, 1188 (9th Cir. 2002)). Beyond being the type of 20/20 hindsight the case law counsels against considering, a reasonable officer is not required to accept the veracity of such a statement in a "tense, uncertain, and rapidly evolving" situation. *See Graham*, 490 U.S. at 396–97. Moreover, the pellet rifle's inoperability at the time Bush was shot is not sufficiently

14

clear from the record for plaintiffs' characterization to defeat summary judgment. *Compare* Menzes Depo. at 24:10–12, 28:19–20 (stating the pellet rifle was not operable), *with* Wallace Depo. at 37:21–38:7 (testing the pellet rifle preserved after the incident and finding it operable). When the officers met Mr. Moseley on the road, he had been out of Bush's presence for several minutes; he could not know whether the pellet rifle was unloaded and inoperable at the time. In any event, the officers were in no position to verify any information about the rifle.

b)      The Approach

After the officers formed their plan, their choice to approach the property was objectively reasonable. Contrary to plaintiffs' argument that the officers acted unreasonably by not "approach[ing Bush] using calm tones, giv[ing him] ample space, and using time as an ally," Pls.' Opp'n at 11, the undisputed record shows the officers did not rush to meet Bush half-cocked. Instead, they took cover at a distance and one of them asked Bush to come out of the house. *See* UMF 35, 38.

In many ways, the situation here parallels that faced by officers in the Ninth Circuit's *Gregory* case. In *Gregory*, officers responded to a location where a suspect was acting in a "bizarre manner" and "possibly [ ] under the influence of drugs." 523 F.3d at 1106–07. When the officers arrived, they found the suspect "holding a pen with its point facing towards them." *Id.* at 1106. The court found this pen was a deadly weapon that could "inflict lethal force" under the circumstances. *Id.* at 1107 (citing *United States v. Bankston*, 121 F.3d 1411, 1412 n.1 (11th Cir. 1997)). The officers in *Gregory* "did not immediately engage in a physical confrontation" with the suspect, but instead "first asked him to drop the pen." *Id.*. Similarly, the officers in this case did not immediately engage with Bush; instead, they moved to the edge of the property and positioned themselves behind a tree and fence post where they attempted to make voice contact. UMF 35, 38. The officers in *Gregory* only physically engaged after the suspect repeatedly and expressly disobeyed their orders. *Gregory*, 523 F.3d at 1107. Likewise, in this case the officers repeatedly attempted to deescalate the situation by ordering Bush, who began walking towards them, to stop, get on the ground, and drop the pellet rifle. UMF 44, 49–51. The

1    weapon here, a pellet gun, is more threatening than the pen in *Gregory*. Thus, under no

2    objectively reasonable reading of the record did the officers in this case force a confrontation.

3          Plaintiff's estate in *Gregory* argued, as do plaintiffs here, the officers acted

4    unreasonably by not accommodating the suspect's mental condition. *Gregory*, 523 F.3d at 1108.

5    The Ninth Circuit, in affirming the district court's grant of summary judgment for the officers,

6    disagreed. The Circuit observed that "first confronting [the suspect] verbally, and only then

7    attempting to disarm and to restrain him"—was objectively reasonable. *Id.* at 1108. As with the

8    officers in *Gregory*, the officers here had reason to believe Bush was a threat to themselves and

9    others. *See id.* at 1108–09. The officers also were objectively reasonable in believing Bush—

10   who was acting erratically, potentially high on methamphetamine, armed with a pellet rifle, and

11   had just been "tearing up" a house with children inside—was a threat to public safety. *See*

12   *Marquez*, 693 F.3d at 1175 (Although "the government has less interest in using force" when

13   police are summoned "to protect a mentally ill offender from himself," "the government has an

14   increased interest in the use of force" "if the officer warned the [suspect] that he would employ

15   force [and] the suspect [still] refused to comply."). As such, the officers' attempt to communicate

16   with Bush, from a distance while taking cover, while assessing and seeking to deescalate the

17   situation, was objectively reasonable.

18                      c)      Use of the K-9

19         When the officers arrived, as noted, they stood at the edge of Mr. Moseley's

20   property to try to give Bush space. *See* UMF 35. From a position of cover, Deputy Cornelius

21   yelled towards the house that the Sheriff's Office was outside, the officers wanted Bush to come

22   out, and they were there to help. UMF 38. In response, Bush emerged holding the pellet rifle.

23   UMF 42. At that point the officers did not attempt to engage with Bush; rather, they repeatedly

24   told Bush to drop the pellet rifle, but Bush did not comply. UMF 50. Bush then advanced

25   quickly towards the officers, all the while yelling and screaming, and swinging the rifle up and

26   down. UMF 43, 47, 49, 51, 52; Menzes Depo. at 15:20–25. Again, no reasonable jury would

27   find Bush did not force the confrontation. *See Lal*, 746 F.3d at 1118 (officers' use of deadly force

28   reasonable where officers were "patient" and "tried to talk [the suspect] into surrendering," but

suspect forced confrontation by holding large rock threateningly over his head). The officers were not required to retreat at this point, especially with an unpredictable suspect waving a pellet rifle and moving in their direction. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1080 (9th Cir. 2009) (en banc) ("telling police in the middle of the standoff that they must withdraw or what tactics are permissible does not strike us as a reasonable role for a judicial officer under the Fourth Amendment."); *Lal*, 746 F.3d at 1117 (officers not required to retreat from suicidal individual who was walking alongside the road, creating a potential risk to the public).

With an armed man moving quickly towards them, waving a pellet rifle and yelling, it was reasonable for the officers to take some kind of action. No reasonable jury would find the action they took, deploying the K-9, was objectively unreasonable under the tense, extremely rapidly evolving circumstances. It is undisputed that when Bush saw the K-9 advancing towards him, he threw the pellet rifle on the ground and appeared to surrender. UMF 53; Cornelius Depo. at 109:18–24. With the pellet rifle on the ground, the officers reasonably perceived the threat as diminished and left their positions of cover to subdue Bush and maintain control of the K-9. *Cf. Henrich*, 39 F.3d at 915 ("Officers [ ] need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act [reasonably].").  As such, the use of a K-9 here was objectively reasonable.

d) <u>The Shooting</u>

Turning to the shooting itself, Deputy Cornelius's use of deadly force can be deemed objectively reasonable only if he had probable cause to believe that Bush posed a threat of serious physical harm to himself or others. *Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) (quoting *Garner*, 471 U.S. at 11); *Price v. Sery*, 513 F.3d 962, 968 (9th Cir. 2008). "That requires [the court] to consider exactly what was happening when the shot was fired." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014).  In this case, it is undisputed that Bush had picked up the pellet rifle and was holding it again when Deputy Cornelius shot him. Cornelius Depo. at 121:22–23; Menzes Depo. at 38:8–15 ("I'm pretty sure [Bush] got his hands on [the rifle] … again. I remember him getting his hands down there . . . he leaned pretty far over, it looked like a support – he grabbed it and it looked like . . . he was supporting himself that way for

17

a second, but they shot him before I could see if it was actually in his possession." ) It is well-established that it is unreasonable for officers to "kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997); *see also Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (officers acted unreasonably when they shot suspect who possessed a gun but was not facing them and was not pointing gun at them when they shot); *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1234–35 (9th Cir. 2013) (officers acted unreasonably when they shot suspect holding knife who was moving towards them but not charging or pointing knife at them, where officers never told him to stop or saw him acting threateningly). On the other hand, officers have probable cause to use deadly force when the suspect is acting erratically and threatens them with a weapon. *City of Hemet*, 394 F.3d at 704 ("[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."); *Reynolds*, 84 F.3d at 1168 (deadly force reasonable where erratic suspect swung knife at officer); *Henrich*, 39 F.3d at 914 (deadly force objectively reasonable where suspect points gun at officers).

Plaintiffs contend Deputy Cornelius's use of deadly force here was unreasonable because (1) the officers knew the pellet rifle was inoperable after Bush threw it to the ground and it broke open; and (2) even after he picked it up again, Bush never pointed the pellet rifle at the officers. Pls.' Opp'n at 13–15. The court considers these arguments in turn.

(1)    <u>Whether the Pellet Rifle was Operable</u>

Relying exclusively on the testimony of eyewitness Daniel Menzes, Victoria Moseley's oldest son by a prior marriage, plaintiffs argue the officers were on notice the pellet rifle was inoperable because when Bush threw it to the ground, the pellet rifle broke open, and the officers were close enough to see a spring fall out. Pls.' Opp'n at 13. This argument is insufficient to defeat summary judgment for two reasons.

First, the physical evidence of record flatly contradicts Menzes's testimony. As the Supreme Court has explained,

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (brackets, citations, and quotations omitted).

Defendants' forensic expert, Martini, analyzed the spring that plaintiffs' private investigator "located and collected from the ground by a private investigator and subsequently submitted as evidence by Plaintiff." Martini Expert Report at 13. Martini consulted with a representative from the manufacturer of Bush's pellet rifle, who "confirm[ed] that the configuration and dimensions of [plaintiffs'] spring excludes the possibility that it came from the incident Powerline 1000 air rifle or any Daisy Powerline 1000 rifle as manufactured." *Id*. Additionally, a criminalist in the California Department of Justice Laboratory test-fired Bush's pellet rifle after the incident and found it operable. Wallace Depo. at 37:21–38:7.

Plaintiffs attempt to dispute the objective physical evidence with the eyewitness of Menzes, who contends the officers were close enough to see a spring fall out of Bush's pellet rifle. Menzes makes repeated assertions that he saw a spring fall out, while also saying the officers blocked his view of Bush at the time of the shooting. Menzes Depo. at 41:1–12. Menzes was standing with Mr. Moseley behind a fence, beyond the yard, *see* Menzes Depo. at Ex. 17, when he says he saw the spring fall out. It is undisputed the spring plaintiffs' investigator found, measuring one inch long by 5/16 inch wide, did not match the type of spring that was a component of the pellet rifle Bush held. Martini Expert Report at 13. Plaintiffs' other eyewitness, Victoria Moseley, testified the pellet rifle had lost a spring weeks before the incident. Moseley Depo. at 71:11–16. No evidence in the record supports the conclusion that any officer saw anything fall out of Bush's pellet rifle. No reasonable jury, therefore, could conclude any officer saw a spring fall from the pellet rifle, disarming it. *See Scott*, 550 U.S. at 380; *Gregory*, 523 F.3d at 1108; *Skylstad v. Reynolds*, 248 F. Appx. 808, 811 (9th Cir. 2007) (no genuine dispute when witnesses' declarations "directly contradict[ed]" by medical records).

Second, as reviewed above, the Fourth Amendment does not require officers to be in "actual, imminent danger of serious injury" before they use deadly force; instead, the officer need only "reasonably believe[ ] that the suspect pose[s] a threat of serious harm to the officer or to others." *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (changes and quotations omitted); *see Bowles v. City of Porterville*, 571 F. App'x 538, 540-41 (9th Cir. 2014) (applying "reasonable belief" standard to find no Fourth Amendment violation when officer reasonably but mistakenly believed suspect's cologne bottle was weapon). In this case, even if the pellet rife was inoperable, Deputy Cornelius had no way of knowing this; the law does not require that he have waited for Bush to pull the trigger before responding with deadly force. *See George*, 736 F.3d at 838 ("[Officers are not required] to delay their fire until a suspect turns his weapon on them."); *Hayes*, 736 F.3d at 1232–33 ("[Courts may] only consider the circumstances of which [the officers] were aware when they employed deadly force."). Accordingly, that one witness claims Bush's pellet rifle was inoperable does not, in light of the contrary physical evidence, undermine the officers' reasonable belief of imminent danger.

(2)      Whether Bush Pointed the Pellet Rifle at the Officers

Relying on the testimony of Victoria Moseley and Daniel Menzes, plaintiffs argue there is a dispute of fact as to whether Bush pointed the pellet rifle at Deputy Cornelius immediately before Cornelius shot him, foreclosing summary judgment. Pls.' Opp'n at 11–12. Defendants argue the testimony of both Victoria Moseley and Menzes are inconsistent with the objective physical evidence. Defs.' MSJ at 21.

If Bush did point the pellet rifle at Deputy Cornelius, as defendants say, Deputy Cornelius's fear for his life would have been reasonable and he would have been justified in using deadly force. *See Menjivar v. City of L.A.*, No. 06-02201, 2007 WL 4662062, at *6 (C.D. Cal. July 24, 2007) (no Fourth Amendment violation where fleeing suspect turned and pointed gun at officer); *Garcia*, 826 F.2d at 812 (no Fourth Amendment violation where suspect attacked border patrol agent with rock and stick); *Henrich*, 39 F.3d at 914–15 (suggesting deadly force objectively reasonable where suspect points gun at officers). The converse, however, is not necessarily true. Even if Bush did not point his pellet rifle directly at Deputy Cornelius, Deputy

20

Cornelius was not required to wait for him to do so before responding with deadly force. *See George*, 736 F.3d at 838 ("If a person is armed . . . a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). Here, Victoria Moseley testified Bush was holding the pellet rifle in his right hand by the barrel when Deputy Cornelius shot him. Moseley Depo. at 79:5–80:8. Defendants have "point[ed] to no videotape, audio recording, or similarly dispositive evidence that 'blatantly contradicts' or 'utterly discredits' [her] side of the story." *See George*, 736 F.3d at 836 (quoting *Scott*, 550 U.S. at 380). Because the parties dispute this fact, the question, then, is whether this dispute is material. For the following reasons, the court finds it is not.

After Bush threw down the pellet rifle, it was objectively reasonable for the officers to perceive Bush as a diminished threat and leave their positions of cover. Then, when the K-9 unexpectedly veered away from Bush and Bush retrieved the pellet rifle off the ground, UMF 55, it was reasonable for the officers to perceive Bush as a threat to their physical safety for multiple reasons. First, Bush repeatedly ignored the officers' renewed orders that he stop, get on the ground, and drop the pellet rifle. The Ninth Circuit generally accepts that officers reasonably perceive a heightened risk of serious physical harm when a suspect disobeys the officers' orders in a way that signals active resistance. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1020 (9th Cir. 2015) (noting significance disobedience of officer commands plays in an excessive force analysis); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1104 (9th Cir. 2013) (same); *cf. Young v. Cty. of L.A.*, 655 F.3d 1156, 1168 (9th Cir. 2011) (refusing to take a knee did not telegraph danger when criminal act was misdemeanor trespass); *see also Woodward v. Town of Battleboro*, No. 02-35, 2006 WL 36906, at *7 (D. Vt. Jan. 5, 2006) (suspect disobeyed orders to drop his knife); *Hayes v. City of Dearborn*, No. 04-71826, 2005 WL 3501413, at *4 (E.D. Mich. Dec. 21, 2005) (suspect attempted to injure officers with vehicle and disobeyed orders to stop); *Billingsley v. City of Omaha*, 277 F.3d 990, 993–94 (8th Cir. 2002) (suspect did not halt after being ordered to stop multiple times); *Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997) (suspect disobeyed orders to get on ground); *Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001) (suspect lowered his hands in disobedience of officer's order).

Second, the officers at that point had no cover. Cornelius Depo. at 127:12–14. With the officers standing exposed in the middle of a yard directly in front of a suspect holding a pellet rifle, no reasonable jury could find the officers' belief they could not safely retreat unreasonable. *Cf. Mace v. City of Palestine*, 333 F.3d 621, 624–25 (5th Cir. 2003) (officers' use of deadly force was reasonable where "close quarters of a mobile home park . . . limited the officers' ability to retreat").

Third, the officers at that point had no less lethal force option immediately available. *Cf. Hughes*, 841 F.3d at 1087 (officers are required to consider whether less intrusive force alternatives are available). Their planned less lethal force option, the K-9, had unexpectedly veered away, and the officers had no immediate access to another less-lethal option. Sergeant Keeling's less lethal beanbag shotgun was in his patrol car. UMF 92. Deputy Cornelius and Deputy Evans had their guns in their hands, with their Tasers holstered; if they had drawn their Tasers, they were standing approximately 17 feet from Bush, and the parties agree Tasers are effective only up to 14 feet, UMF 22. Even if the officers could have avoided using deadly force had they preplanned a range of alternative less lethal force options, no reasonable jury could find their actions were unreasonable. Plaintiffs cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Billington*, 292 F.3d at 1190.

Fourth, adding to the officers' perception of danger, Bush was agitated, screaming at them, and appeared high on something. *See Loch v. City of Litchfield*, 837 F. Supp. 2d 1032, 1040 (D. Minn. 2011), *aff'd*, 689 F.3d 961 (8th Cir. 2012) ("Adding to the perceived danger . . . is the fact that [the suspect] was intoxicated and agitated."). In light of Bush's behavior, "there was no reason for the officers to believe that [Bush] would act rationally." *See Lal*, 746 F.3d at 1118–19.

Fifth, it is undisputed that Bush repeatedly banged the pellet rifle over his knee before Deputy Cornelius shot him. UMF 60. Combined with Bush's other erratic behavior, an officer could reasonably perceive Bush's unpredictable movements as a safety risk. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1078–79 (9th Cir. 2014) (reasoning police would be justified in

shooting suspect behaving "dangerous[ly] and erratic[ally]" who reached for his waistband). Deputy Cornelius's situation was precarious, and again, the Fourth Amendment did not require him "to delay [his] fire until [Bush] turn[ed] his weapon on [him]." *See George*, 736 F.3d at 838. That Bush "may have been intent on committing 'suicide by cop' does not negate the fact that he threatened the officers with such immediate serious harm that shooting him was a reasonable response." *See Lal*, 746 F.3d at 1119. Deputy Cornelius was "justified in responding to" Bush's threatening behavior "by opening fire." *See Cruz*, 765 F.3d at 1078–79.

With no cover and faced with an unpredictable suspect who was ignoring orders and banging a pellet rifle over his knee, Deputy Cornelius's use of deadly force was reasonable. The other officers' actions, including those of Deputy Cornelius's supervisor, Sergeant Keeling, also were reasonable. *See Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) ("If . . . the officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable.") (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)). Accordingly, the court finds no reasonable jury could find the officers' use of deadly force was unreasonable.

e)    The Emergency Care

Defendants also move for summary judgment on plaintiffs' allegation that the officers failed to provide reasonable medical aid in the course of seizing Bush. Defs.' MSJ at 24. Plaintiffs do not address this claim in their opposition. It is undisputed that Deputies Cornelius and Evans attempted to resuscitate Bush, but no emergency life-saving services of any kind could have saved him. UMF 65. The court finds no reasonable jury could find the officers did not provide reasonable medical aid.

2.    Clearly Established Law

Even if the court were to find the officers unlawfully seized Bush with excessive force, it would conclude the officers are entitled to qualified immunity because the officers did not violate clearly established law. For an officer to violate clearly established law, the law's contours must have been "sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774

(2015) (brackets, ellipsis, and quotations omitted). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (brackets and quotations omitted). Qualified immunity affords officers the benefit of the doubt in close calls, since "offic[ers] should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation omitted).

The court must "not [ ] define clearly established law at a high level of generality," and the "inquiry must be undertaken in light of the specific context of the case." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotations omitted). The dispositive inquiry is whether it would be clear to every reasonable officer that the conduct was unlawful in the situation he confronted. *See Taylor v. Banks*, 135 S. Ct. 2042, 2044 (2015); *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Such specificity is especially important in the Fourth Amendment context because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (brackets and quotation omitted).

At trial, it would be plaintiffs' burden to prove an allegedly violated right was clearly established at the time of the violation. *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011); *Maraziti v. First Interstate Bank of Cal.*, 953 F.2d 520, 523 (9th Cir. 1992). In opposition to summary judgment, however, plaintiffs attempt to turn the burden on its head by arguing defendants have failed to cite authority that would entitle defendants to qualified immunity. *See* Pls.' Opp'n at 12–13 (arguing defendants fail to provide a case holding it was reasonable to use deadly force when the officers knew Bush carried a pellet rifle). But the "qualified immunity defense protects officers as the rule rather than the exception." *Loch*, 837 F. Supp. 2d at 1042 (citing cases). Relying in part on *Garner*, 471 U.S. at 3, plaintiffs merely argue "it was clearly established that the use of deadly force was reasonable only if an officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Pls.' Opp'n at 14. However, for this court to find Deputy Cornelius violated clearly established law, the court must "identify a case where an officer acting

24

under similar circumstances as [Deputy Cornelius] was held to have violated the Fourth

Amendment." *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curium).  As the Supreme

Court has cautioned, *Garner* and its progeny "lay out excessive-force principles at only a general

level," and "do not by themselves create clearly established law outside an obvious case." *Id.*

(citations and quotations omitted).

This is not a case where it is obvious there was a violation of clearly established

law under *Garner*.  As previously stated, Bush was acting erratically, refusing the officers'

orders, and banging a pellet rifle against his knee.  Even if the court were to find Deputy

Cornelius's use of force unreasonable, plaintiffs do not cite and the court is not aware of any case

that would have put the deputy on notice he could not use deadly force "in light of the specific

context of [this] case." *See Mullenix*, 136 S. Ct. at 308.  In *Hayes*, 736 F.3d at 1234, the Ninth

Circuit did hold an officer's use of deadly force against a man holding a knife was unreasonable.

But in *Hayes*, the man was not warned to stop or "given an indication [ ] his actions were

perceived as a threat," was not charging the officer, was not acting erratically, and had threatened

no one.  *Hayes* would not have put Deputy Cornelius on notice because Bush was acting

erratically and was repeatedly told to stop, drop his weapon, and get on the ground.

In *Lal*, cited above, the Ninth Circuit found reasonable officers' use of deadly

force against a suspect intent on committing suicide by cop.  746 F.3d at 1118–19.  The officers

in *Lal* encountered a suspect who forced a confrontation, ignored the officers' directions,

advanced on them, and threatened the officers with a weapon in the form of a large rock to

provoke a response.  *Id.*  The parallels between *Lal* and the instant case weigh strongly against

finding Deputy Cornelius and the other officers violated clearly established law.

Considering how quickly events unfolded and the totality of the circumstances, an

officer in this case cannot be said to have to been "plainly incompetent" for believing his life was

in immediate danger.  *See Sheehan*, 135 S. Ct. at 1774.  The court therefore GRANTS

defendants' motion for summary judgment as to this claim.

B.       Violation of 42 U.S.C. § 1983 – Fourteenth Amendment Due Process

Defendants also move for summary judgment on plaintiffs' due process claim. Under the Fourteenth Amendment, Bush's mother and child as plaintiffs have a constitutionally protected liberty interest in Bush's "companionship and society." *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008); *Hayes*, 736 F.3d at 1229–31.  A cognizable violation of due process occurs when officers' conduct "shocks the conscience" in depriving plaintiffs of that liberty interest.  *Porter*, 546 F.3d at 1136 (citing *Cty of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998)). "Conscience-shocking actions are those taken with (1) 'deliberate indifference' or (2) a 'purpose to harm . . . unrelated to legitimate law enforcement objectives.'" *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  However, deliberate indifference only shocks the conscience "where actual deliberation is practical."  *Hayes*, 736 F.3d at 1230.  "[I]n circumstances where an officer cannot practically deliberate, such as where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *A.D.*, 712 F.3d at 453.

In this case, the decision to use deadly force against Bush reflects a split-second judgment – literally – based on the rapidly unfolding events after the K-9 unexpectedly veered away from Bush, with Bush then retrieving the pellet rifle from the ground.  The parties agree everything happened "extremely fast." *See, e.g.*, Moseley Depo. at 105:7–12; Evans Depo. at 67:4–5.  The decision to react with deadly force after Bush retrieved the pellet rifle from the ground was sudden and did not allow time for deliberation. *See Hayes*, 736 F.3d at 1230 (collecting cases).  Accordingly, the court applies the "purpose to harm" standard. *See id.*

There is no evidence in the record that any deputy acted with a purpose to harm unrelated to the legitimate law-enforcement objectives of defending himself and protecting others. *See id.* at 1230–31; *Wilkinson*, 610 F.3d at 554–55.  The court GRANTS defendants' motion for summary judgment as to plaintiffs' Fourteenth Amendment substantive due process claim.

1          C.      _Monell_ Violation

2                  Defendants also move for summary judgment on plaintiffs' _Monell_ claim.  "While

3     the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on

4     a violation of constitutional rights."  _Henrich_, 39 F.3d at 916.  Because this court has found no

5     reasonable factfinder could conclude a constitutional violation occurred in this case, the court

6     GRANTS defendants' motion for summary judgment as to this claim.

7          D.      Negligence

8                  Defendants also move for summary judgment on plaintiffs' claim that defendants

9     negligently shot Bush.  In California, "an officer's lack of due care can give rise to negligence

10    liability for the intentional shooting death of a suspect."  _Hayes_, 736 F.3d at 1232 (quoting _Munoz_

11    _v. Olin_, 24 Cal. 3d 629, 634 (1979)).  Negligence requires showing: (1) a duty to use due care;

12    (2) a breach of that duty; (3) proximate or legal causation; and (4) damages resulting from the

13    breach.  _Ladd v. Cty. of San Mateo_, 12 Cal. 4th 913, 917 (1996).

14                 Although an officer must always act reasonably when using lethal force, what

15    reasonable means differs in Fourth Amendment and state negligence contexts.  _Brown v._

16    _Ransweiler_, 171 Cal. App. 4th 516, 534 (2009) (quotation omitted); _Billington_, 292 F.3d at 1190.

17    State negligence claims "consider[] the totality of the circumstances surrounding any use of

18    deadly force," whereas federal excessive force claims "focus more narrowly on the moment when

19    force is used . . . . "  _Hayes v. City of San Diego_, 57 Cal. 4th 622, 638 (2013).  At the same time,

20    akin to federal courts' evaluation of Fourth Amendment excessive force claims, California

21    negligence law evaluates reasonableness from the perspective of an officer on the scene; not

22    "with the 20/20 vision of hindsight."  _Id._ at 638 (quoting _Graham_, 490 U.S. at 396).  Thus, "[l]aw

23    enforcement personnel have a degree of discretion as to how they choose to address a particular

24    situation."  _Id._  If they act within "the range of conduct that is reasonable under the

25    circumstances" there is no requirement that they choose the "most reasonable" action or the

26    conduct that is the least likely to cause harm" to avoid negligence liability.  _Id._

27

28

1                    1.    Pre-Shooting Conduct Under State Negligence Law

2              The distinction between state and federal use-of-force standards is clear when an

3     officer's pre-shooting conduct provokes the dangerous situation that caused the deadly shooting.

4     In that scenario, "tactical conduct and decisions preceding the use of deadly force are relevant

5     considerations under California law" and could show, as part of the totality of the circumstances,

6     the use of deadly force was unreasonable, even if the same use of deadly force was reasonable

7     under Fourth Amendment law.  *Hayes*, 57 Cal. 4th at 625.  *Grudt* exposes this precise dichotomy.

8     *See Grudt v. City of L.A.*, 2 Cal. 3d 575, 587 (1970).  In *Grudt*, the California Supreme Court held

9     the officer's decision to shoot the suspect was justified under the Fourth Amendment because the

10    suspect was accelerating his truck toward the officer at the time.  Yet the officers' questionable

11    pre-shooting conduct made summary judgment on the negligence claim inappropriate.  *Id.* at 585–

12    88.  Officers had approached Grudt's car in civilian clothes, in a high crime area, late at night,

13    and rapped their gun muzzles on his window.  *Id.* at 587.  Grudt was hard of hearing and thought

14    he was being robbed, so he accelerated towards a second plainclothes officer who then opened

15    fire on him.  *Id.*  The court found a jury might impose negligence liability after taking account of

16    the pre-shooting conduct, and emphasized if there is "'a reasonable doubt as to whether such

17    questioned conduct falls within or without the bounds of ordinary care then such doubt must be

18    resolved as a matter of fact rather than of law.'"  *Id* at 587 (citing *Toschi v. Christian*, 24 Cal. 2d

19    354, 360 (1944)).

20             A federal district court in *Howard* also cited an officers' pre-shooting conduct as

21    reason to deny summary judgment on a negligence claim, despite the reasonableness of the

22    shooting under Fourth Amendment law.  *See Howard v. Cty. of Riverside*, No. EDCV1200700

23    VAPOPX, 2014 WL 12589650, at *9–10 (C.D. Cal. May 7, 2014).  In *Howard*, an armed and

24    dangerous suspect fled felony arrest and was thought to be hiding in an unlocked closet in a

25    small, dark, enclosed shed.  *Id.* at 9.  Instead of waiting for a K-9 unit, one lone officer crawled

26    into the shed, with limited cover from other officers, and opened the closet.  *Id.*  When the suspect

27    quickly emerged, the officer shot him in the face without warning.  *Id.*  Although the suspect bore

28    no weapon, the close confines and quick movements rendered the fatal shot reasonable under the

Fourth Amendment. *Id.* But the court held that a jury could find negligence liability based on the pre-shooting decision to send a lone officer into a small, enclosed storage shed to open the door to the closet where a potentially armed and dangerous suspect might be hiding, rather than waiting for K-9 support. *Id.* at 10.

In *Biscotti v. Yuba City*, the Ninth Circuit found the district court erred in granting summary judgment for the officers on plaintiff's negligence claim without considering pre-shooting facts that colored the reasonableness of the ultimate shot. *See* 636 F. Appx. 419, 421–22 (9th Cir. 2016). There, the decedent emerged from her porch with a gun and did not obey officers' commands; they then shot her. *Id.* at 421. Although the shooting was reasonable under the Fourth Amendment, the court faulted the district court for disregarding the officers' pre-shooting tactical decisions that "obscured their law enforcement identity and increased the likelihood of a violent and deadly encounter." *Id.* The pre-shooting conduct involved the officers' arriving after dark, knowing one occupant of the house might be armed and intoxicated. *Id.* Instead of parking their marked cruisers in a visible spot, the officers approached from the side wearing dark uniforms, partially hid behind pillars, did not announce themselves as police officers, and then "shouted imperceptible orders at one of the residents who walked onto her porch." *Id.* at 422. The court found this pre-shooting tactical approach raised a reasonable dispute as to the officers' negligence in triggering the violent finale, and thus there was a triable issue as to whether the officers' ultimate decision to shoot was reasonable under California negligence law. *Id.*

2. <u>Discussion</u>

Here, plaintiffs base much of their negligence claim on the officers' pre-shooting conduct, contending the officers unreasonably used "counter intuitive and ill-fated" tactics in approaching Bush, given his mental state. *See* Pls.' Opp'n at 11–12. Unlike the cases discussed above, no reasonable jury could find the officers' pre-shooting conduct here was unreasonable under California negligence law. In contrast to the facts here, in *Grudt*, the officers approached a hearing-impaired man's car in civilian clothes, with guns drawn in a dark high crime area; they rapped their guns on his window, then shot him when he tried to drive away. In *Thomas*, officers

made a rash decision to send a lone officer into a small space where an armed and dangerous target of a felony arrest warrant might have been hiding rather than waiting for a K-9 or other proper backup. And in *Biscotti*, the officers approached a home with a potentially intoxicated and armed individual inside, after dark, obscured their identity, shouted unclear commands, and then, without warning, shot a resident when she appeared with a gun.

Here, quite differently, the undisputed evidence demonstrates officers were methodical and engaged in reasonable exercises of judgment in their pre-shooting conduct. The officers met beforehand to devise a plan to deal with a suicidal, erratic, unstable, armed individual. UMF 15. They arrived in marked cruisers and uniforms, in daylight, surveyed the scene, talked to people on the scene, clearly announced their presence, waited outside the house, and shouted to Bush that they were here to help him. UMF 35–38. Bush emerged, yelling in part unintelligibly, and immediately advanced on them with a pellet rifle. UMF 42, 47–48. The officers clearly and repeatedly commanded him to drop his weapon. UMF 49–51. Once he did not and instead advanced on the officers, they tried first to use the K-9 as a less lethal method to defuse and disarm Bush. UMF 55. Although Bush initially dropped his rifle, when the K-9 unexpectedly veered away, he picked it back up and pointed it at the officers. UMF 55. It was at this point that Deputy Cornelius shot Bush.

Plaintiffs are critical of the officers' tactical decisions, including choosing to deploy a K-9 when they knew another dog was on the property, using guns instead of non-lethal weapons, and not tailoring their negotiation tactics to the needs of a person who was mentally distraught. *See* Pls.' Opp'n at 11–12. The law of negligence does not require officers to choose the "'most reasonable' action or the conduct that is the least likely to cause harm," so long as their conduct falls "within the range of conduct that is reasonable under the circumstances." *Hayes*, 57 Cal. 4th at 632 (citation omitted). Here, no reasonable jury could find using a K-9 as the officers did was unreasonable. The K-9 was properly trained, evaluated and certified. Evans Decl. ¶ 4. While the officers were told of the other dog on the property, that dog was chained up; plaintiffs cite no evidence to suggest the law enforcement K-9 had a history of noncompliance, or authority for the proposition that the presence of the chained dog counseled against use of a K-9 at all.

Deputy Evans did explain in deposition that his K-9 "is not trained to avoid distractions, such as pit bulls" but that "[h]e is not aggressive towards other animals." Evans Depo. at 59:20–24. Moreover, even if the use of the K-9 was a mistake, the court finds the immediate danger Bush appeared to pose created a particularly broad zone of officer discretion in their use of tools of their trade. *See* UMF 33. That the officers also had less lethal weapons including Tasers on their persons does not render their decision to use a K-9 first unreasonable, nor the split second decision to shoot after the K-9 misfired. Having carefully considered the question, the court finds no reasonable jury could find the officers' conduct leading up to the shooting did not fall well within the "range of conduct that is reasonable under the circumstances." *Hayes*, 57 Cal. 4th at 632.

"Reasonableness" under the Fourth Amendment and "reasonable care" under a negligence theory are synonymous insofar as they consider the same conduct. *See Hernandez v. City of Pomona*, 46 Cal. 4th 501, 513–17 (2009); *Atkinson v. Cty. of Tulare*, 790 F. Supp. 2d 1188, 1211 (E.D. Cal. 2011) (negligence and battery "measured by the same reasonableness standard of the Fourth Amendment") (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272–73 (1998)). Thus, the analysis set forth in the Fourth Amendment discussion above applies equally to the reasonableness analysis here under state negligence law.

No reasonable jury would find the officers' use of deadly force was negligent. Accordingly, the court GRANTS summary judgment for defendants as to plaintiffs' negligence claim.

E. <u>Assault and Battery</u>

Defendants also move for summary judgment on plaintiffs' assault and battery claim. "A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown*, 171 Cal. App. 4th at 527 (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 n.6 (2004)). Because the court has found no reasonable jury could find the officers' use of force in this case to be unreasonable as to the excessive force claim, the court GRANTS defendants' motion for summary judgment as to this state claim as well.

F.      Intentional Infliction of Emotional Distress

Plaintiffs' intentional infliction of emotional distress claim in this case is derivative of its battery claim. *See Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1415 (2002) (finding plaintiffs' "intentional infliction of emotional distress [claim to be] derivative of [plaintiffs'] battery [claim]" in an excessive force case). Because the court finds no reasonable jury could find defendants' use of force was unreasonable, the court GRANTS defendants' motion for summary judgment as to this claim.

G.      Negligent Infliction of Emotional Distress

As the name implies, a claim for negligent infliction of emotional distress requires that plaintiffs prove defendants acted negligently. *See Ra v. Superior Court*, 154 Cal. App. 4th 142, 144 (2007). Because the court finds no reasonable jury could find defendants acted negligently, the court GRANTS defendants' motion as to this claim.

H.      Wrongful Death

California Civil Procedure Code section 377.60 provides "[a] cause of action for the death of a person caused by the wrongful act or neglect of another." The elements of such a claim are "the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (Cal. Ct. App. 2006) (quotation and citation omitted).

Because the court finds no reasonable jury could find the officers committed tort violations, the court GRANTS defendants' motion for summary judgment as to this claim.

I.      Bane Act Violation – California Civil Code section 52.1

"The Bane Act provides a civil cause of action against anyone who 'interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state.'" *Simmons v. Superior Court*, 7 Cal. App. 5th 1113, 1125 (Ct. App. 2016) (quoting Cal. Civ. Code § 52.1). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threat, intimidation or coercion'), tried to or did prevent the plaintiff from doing something

he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *King v. State*, 242 Cal. App. 4th 265, 294 (2015) (quotation and brackets omitted). The Ninth Circuit has held that the elements of a Bane Act claim are the same as the elements for excessive force under section 1983. *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1105 (9th Cir. 2014); *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013).

Because the court finds no reasonable jury could find the officers violated Bush's constitutional rights or state tort law, the court GRANTS defendants' motion for summary judgment as to the Bane Act claim as well.

IV.    <u>CONCLUSION</u>

For the reasons stated above, the court GRANTS defendants' motion for summary judgment in its entirety. This case is now CLOSED.

DATED: April 28, 2017.

_____
UNITED STATES DISTRICT JUDGE